Marcus F. Stephenson, Respondent, v. S. G. Richards *et al.*, Appellants.

### Kansas City Court of Appeals, May 25, 1891.

Payment : POSSESSION OF PAST DUE NOTE : PRESUMPTION : LOSS UNACCOUNTED FOR : EVIDENCE. The possession of a past due note and its production at the trial, where its payment or non-payment is the issue, makes a *prima facie* case of payment, and strongly corroborates the evidence of the maker that he had paid it, especially in the absence of any explanation from the owner as to how it got out of his possession. But, if the testimony discloses the fact that he did not pay it, it is not requisite that its loss should be accounted for. The evidence in this case reviewed and found insufficient to establish payment.

Stephenson v. Richards.

*Appeal from the Audrain Circuit Court.*—HON. E. M. HUGHES, Judge.

REVERSED.

*Geo. Robertson*, for appellants.

(1) Instruction, numbered 3, given by the court at plaintiff's request, was misleading, as it told the jury that possession of the note by plaintiff raised a presumption of payment, unless explained by the testimony in the case, and, further on, that it devolved upon the defendants to make such explanation. This is the effect of this instruction, and the jury might disbelieve plaintiff's story of payment, and, yet, if defendants could not explain his possession, the jury will still find for plaintiff. It was calculated to confuse and mislead the jury, and is also in conflict with number 1, given on the part of defendants. The latter declares the law correctly. Edwards, Bills and Notes [3 Ed.] sec. 722. (2) This court will review the testimony of the case, and set aside the finding of the jury, which is only advisory at best. *Snell v. Harrison*, 83 Mo. 651; *White v. Pendry*, 25 Mo. App. 542. The appellate court will not, in this case, defer to the finding of the chancellor, as the chancellor made no finding; he simply adopted the finding of the jury. The court should make the finding itself. The only purpose of a jury in an equity case is to advise the court, which advice the court may accept or reject.

*Elijah Robinson* and *W. W. Fry*, for respondent.

(1) Possession of the note by plaintiff, the maker, was *prima facie* proof of payment. (2) The appellate court will not set aside the finding of the jury and the lower court. *Whitsett v. Ransom*, 79 Mo. 258.

ELLISON, J.—This is a suit begun at the October term, 1889, of the Audrain county circuit court, to restrain the appellants, Richards as trustee, and the Sturgeon Savings Bank, the beneficiary, from selling eighty acres of land under a deed of trust, given by respondent to one William C. Crosswhite as beneficiary, to secure a note for $1,125.25, both of which, the deed of trust and note, are dated December 8, 1884. Respondent claims that said note is paid, and appellants deny its payment. On the eighth day of December, 1884, respondent bought of said Crosswhite said eighty acres of land, and assumed the payment of a deed of trust thereon, and a note for $500 given to one Mrs. Flynn, and made the note and deed of trust sought to be restrained for a part of the purchase price. Mrs. Flynn sold and assigned the $500 note to B. P. Ritchie at about the time plaintiff bought the land, and, some time after the sale, Ritchie bought the $1,125 note of Crosswhite, thus becoming the owner of both notes. The court below submitted the issue of payment to a jury, which found the note had been paid. The court adopted this finding, and entered a decree enjoining the sale under the deed of trust. We are asked to review the case on the facts.

It must be said in plaintiff's favor that by the production of the note at the trial from his possession, past due, made for him a *prima facie* case. But this concession is *all* that can be allowed him out of this record. All else is against him, and the question with us is, is it so much against him, as disclosed by the testimony, as to overthrow his *prima facie* case? We are compelled to answer that it is abundantly so. While there was other testimony than his own, to which we will refer further on, yet the case against him is principally made from his own.

The whole record discloses ( not in direct words, but quite as effectively ) that he was not a man of wealth, or

in the habit of handling large sums of money of his own. There is nothing disclosed going to show that his business affairs were such as to cause him to become so absorbed as to fail to remember the circumstances surrounding the alleged payment of this note. Indeed, this note was, while outstanding, his principal concern, as it well might be, since it was a heavy incumbrance on his home. He paid the annual interest on the note, which accrued on the eighth of December, up to 1886, when not having the money he borrowed of Ritchie's bank $120, with which to pay it and the interest on the $500 note, giving his note with personal security due in ninety days for that amount. He appears to have paid the interest due December, 1887, and during the "first half of December, 1888," he states that he paid the note in controversy as well as the $120 note, which though due in ninety days from December, 1886, he had allowed to run at interest till this time; that he went from his home in the country to Centralia and thence by train to Sturgeon, about eight miles above, and paid the money to Ritchie (no one being present), and took up the note, but not the deed of trust; he left that as he states, so that Ritchie could release the record; that he paid it between two and four o'clock and returned that evening to Centralia on the seven o'clock train. He does not remember whether he went home that night or remained in Centralia, nor does he know whether he got his dinner or his supper, and, if he did get either, where. He did not know whether he saw anyone in Sturgeon that day, could tell of no one he met or spoke to, although he arrived there between one and two o'clock and left at seven. He steadily refused to name a time at which he paid the note any more definitely than the "first half of December." On December 5, he was in Sturgeon and paid $250 on the $500 note which was the first lien on his land, but did not know whether he paid the note in controversy before or after that day. Nor is he able to account for the fact that he

did not pay the whole of the $500 note, unless, as he puts it, "I did not have money enough." But when the suggestion is immediately made to him that then he must have paid off the note in controversy before that, he answers, "I don't know." The balance on this $500 note he let run till the following February. Plaintiff then begins an explanation under the stress of a further cross-examination, as to where and how he got the money to pay the note in controversy and the $120 note. This explanation is, of itself, sufficient to shake our confidence in his testimony as to the main fact. Following, as best we can, the sinuosity of his story to the end, if end it has, the result of his testimony is that he saved the money for the payment of these notes in the years 1887 and 1888, and he obtained the money by selling some corn and by trading and shipping some hogs ; that up to January 1888 (eleven months before the alleged payment), he had accumulated not more than $200, which lacked nearly $1,200 of being sufficient to meet the note in controversy, and the one for $120. Of the corn, he could only account for the sale of one hundred and thirty barrels at $2.50 to $2.75 per barrel. And, of the proceeds of this, he paid nearly, if not fully, one-third, on the note for $500. The balance of the money he says came from trading in hogs. Of these it seemed impossible to get from him any details or particulars, at least none sufficient to account for the money he must have made between January, when he only had $200, and December when he paid the notes. His shipments of hogs amounted to fifteen or twenty cars, and was done through Mr. Mitchell who advanced the money for the purchase of the stock, had the shipments made in his own name, and on receiving the proceeds would deduct the money advanced and $2 per car for its use and turn over the profits, if any, to plaintiff. The utmost ingenuity of counsel failed to elicit from him anything approaching a satisfactory statement as to what his profits were. Mitchell, however, had the

data at hand, and as a witness for the defense stated the profits, all told, were $200.26. It is true plaintiff stated that he made some money by stock purchases which were not shipped ; but, with perhaps one exception, the parties with whom, and the places where, he did this business remain a mystery ; for he shielded himself from each inquiring assault by the answer, "I don't know." And finally, as a climax to his ignorance of the parties of whom he bought or to whom he sold, whereby the money which he laid up was made, he answered, "I don't know anything about it."

Notwithstanding he did stock business through Mitchell, a banker, and that he had an account at the bank, he says that he kept this money at his house in a tin box on the cupboard; that when he went away, it was in charge of his wife, and that when they both were from home, she took it. When asked what kind of money it was, he said, "Most of it was greenbacks, I reckon." And as to how his wife carried it, he answered, "I don't know ; in her pocket, I reckon." During this period of his putting money away in the box, he owed, beside the note in controversy, the notes for $120 and $500 and two or three other notes of from $100 to $200, all drawing eight or ten-per-cent. interest, and yet he says he had money in the tin box at home. He says he was saving it for the note in controversy; but, at the time of the alleged payment of the note in controversy, he says he paid the $120 note, and within a few days, before or after, he paid $250 on the $500 note. During this time he borrowed money. At one time he borrowed $5 of a neighbor to pay a girl who had done some work at his house. As before stated, it appears from his testimony, that when he paid Ritchie no one was present. He brought the money in in a roll. Handed it to Ritchie without counting it, and, as he could not say whether he got any change, it must have amounted to just the sum to liquidate the two notes and interest to that day. He remembers nothing about what he did in

Sturgeon that day, or who saw him, or whom he was with. After the death of Ritchie, plaintiff was notified, perhaps more than once, to pay the interest on the note in controversy. He finally went into Sturgeon on no other business, getting there about noon. He remained in town all that day and night, and did not go to the bank to make inquiry as to the matter until about noon next day. He then went in, and said he had paid the note. His entire conduct during this time was quite unnatural, and his reasons given in explanation are very unsatisfactory.

The fact that plaintiff had possession of the note at the trial is, of course, strongly corroborative of his assertion that he had paid it; especially is it so in the absence of any explanation from defendants as to how it got out of the possession of Ritchie's estate. But, if the testimony discloses the fact that he did not pay it, it is not requisite that its loss should be accounted for. Keeping in mind that plaintiff's case rests upon his assertion that he paid the money to Ritchie in the "first half of December," we find from the testimony of a disinterested witness that it was seen in possession of Ritchie at the bank, *after* that time. Besides such testimony we find that the note was seen by those interested in Ritchie's estate, including the officers of the bank, at different times, up to and after the death of Ritchie. Their testimony is such as to preclude a mistake on their part. Their testimony is false, or the note was not in the plaintiff's possession until after Ritchie's death. It is shown, perhaps, as suggesting a way in which the note came to be in plaintiff's possession, that, after Ritchie's death, those interested in the estate, including two married daughters, were in the bank all or part of two days about June 10, the father having died June 1, looking over and listing notes, among others the note in controversy; and that, during this time, the two ladies were in and out, going

out on the streets in the town, and that they, perhaps, inadvertently gathered up this note and lost it, as it was not seen after that. But, be that as it may, we are satisfied, from the case as it stands, that the note could not have been, and has not been, paid, as alleged by plaintiff. The judgment is reversed. All concur.