GEORGE W. WELLMAN, Trustee in Bankruptcy of Estate of CHRIS VON DER AHE, Appellant, v. KAISER INVESTMENT COMPANY et al.

Division One, December 2, 1914.

1. FRAUDULENT CONVEYANCE: Purpose: Full Value: Wife Preferred. Even though the grantor was hopelessly insolvent at the time he conveyed the property to his wife, and the evidence tends strongly to prove the transfer was made to defraud his other creditors, yet if the grantor was justly indebted to the wife at the time, and the sum of that indebtedness, together with the existing mortgages against the property which she assumed, aggregated an amount equal to or in excess of its then value, the conveyance to her will not be set aside as fraudulent as to his other creditors.

2. ——: Valid Indebtedness: Breach of Promise Notes: Future Marriage. The fact that a transfer of his property by the husband to his wife was made in consideration in part of the surrender to him of notes given by him to her in settlement of her suit for breach of his promise to marry her brought

by her against him prior to their marriage, does not render the conveyance fraudulent, nor did the subsequent marriage invalidate such indebtedness.

3. ———: ———: ———: ———: Presumption of Gift: Lending Notes to Be Used as Collateral Security. In view of the statute declaring that all gifts of money or property by the wife to her husband not in writing shall be void, a delivery to him by her of notes of a third party given her by him in settlement of her suit for breach of his promise to marry her brought before their marriage, would ordinarily raise the presumption of payment, but where it is clear that her intention was to lend the notes to him in order that he might use them as collateral security for the payment of money to be borrowed by him, no presumption of payment will be indulged.

Appeal from St. Louis City Circuit Court.—*Hon. Moses N. Sale*, Judge.

AFFIRMED.

*Kelley & Starke* for respondents.

(1) A failing or insolvent debtor has the right to prefer one creditor over another, even though the effect of the preference is to hinder and delay other creditors, and even though the creditor has knowledge that the debtor intended to hinder, delay or defraud his creditors. Growney v. Lowe, 234 Mo. 696; Stahlhuth v. Nagle, 229 Mo. 582; Gust v. Hoppe, 201 Mo. 300; Wall v. Beedy, 161 Mo. 637; Bank v. Fry, 216 Mo. 34; Alberger v. White, 117 Mo. 363; Sexton v. Anderson, 95 Mo. 379; Albert v. Besel, 88 Mo. 150; Shelley v. Boothe, 73 Mo. 74. (a) A debt due from a husband to his wife stands on as good footing as a debt due to any other person and she may be given a preference over other creditors. R. S. 1909, sec. 8304; Cole v. Cole, 231 Mo. 255; Rice-Stix & Co. v. Sally, 176 Mo. 107; Schufeldt v. Smith, 131 Mo. 288; De Berry v. Wheeler, 128 Mo. 89; Seay v. Hesse, 123 Mo. 462; Hart v. Leete, 104 Mo. 315; Riley v. Vaughan, 116 Mo. 176; Woolen Mills v. Wilson, 87 Mo. App. 145. (b)

There is a very material distinction to be observed between one who purchases for a fresh consideration and one who purchases merely to secure a pre-existing debt. The position of a creditor is in this respect better than that of a purchaser. Gust v. Hoppe, 201 Mo. 300; Wall v. Beedy, 161 Mo. 637; Alberger v. White, 117 Mo. 365; Sexton v. Anderson, 95 Mo. 373; Morgan v. Wood, 38 Mo. App. 264; Deering & Co. v. Collins & Son, 38 Mo. App. 79. (2) Chris Von der Ahe was entitled to a homestead in the equity in the real estate in question over and above the $11,000 deed of trust thereon on and prior to the 3rd day of September, 1902, which was the date on which he conveyed his equity in said real estate to his wife, Anna K. Von der Ahe, in payment of the $4800 he owed her. Speery v. Cook, 247 Mo. 132; Sharp v. Stewart, 185 Mo. 529; Finnegan v. Prindeville, 83 Mo. 517; Zollinger v. Dunnaway, 105 Mo. App. 36; Tennent v. Pruitt, 94 Mo. 145. (3) The deeds from Chris and Anna K. Von der Ahe to John S. King and from King to Anna K. Von der Ahe, dated September 3, 1902, by which Chris Von der Ahe's title to his equity in the real estate in question was conveyed to said Anna K. Von der Ahe in payment of her legal debt against him, amounting to $4800, were valid conveyances made to, prefer her as a creditor. (a) The fact that said deeds recited a consideration of $1000 makes no difference, because it is competent to show, and was shown by the uncontradicted parol testimony that the real consideration of said deeds was a prior legal indebtedness from Chris Von der Ahe to Anna K. Von der Ahe amounting to $4800. Deeds supported by such consideration are not voluntary conveyances. Clark v. Lewis, 215 Mo. 190. (4) The relationship of the parties and the insolvency of the grantor are not sufficient to establish fraud. Robinson v. Dryden, 118 Mo. 539. A finding of fraud can never be based on mere presumption. When an act may be as fairly attributed to good mo-

tives as well as to bad, a proper motive is presumed to exist. Lumber Co. v. Crommer, 202 Mo. 521; Kilpatrick v. Wiley, 197 Mo. 159; Bank v. Worthington, 145 Mo. 100; Webb v. Derby, 94 Mo. 629; Robinson v. Dryden, 118 Mo. 534.

*D. J. O'Keefe* for appellant.

(1) Insolvency of debtor at the time of transfer of property sufficiently appears from the evidence. 14 Am. & Eng. Ency. Law, 308; Walsh v. Ketchem, 84 Mo. 427; Hoffman v. Nolte, 127 Mo. 120. (2) No consideration passed from defendant Anna K. Von der Ahe to her husband, the bankrupt, at the time of the transfer of the real estate, nor was there any existing debt in favor of defendant Anna K. Von der Ahe established by the evidence which would validate the transfer of real estate. Sloan v. Tory, 78 Mo. 623; McClain v. Abshire, 63 Mo. App. 333; Hoffman v. Nolte, 127 Mo. 120; Patton v. Bragg, 113 Mo. 595; Martin v. Estes, 132 Mo. 402; Shelly v. Booth, 73 Mo. 74; Frank v. Curtis, 58 Mo. App. 349; McKenny v. Wade, 43 Mo. App. 152; Forwell v. Meyer, 67 Mo. App. 566; Mayberg v. Jacobs, 40 Mo. App. 128; Simmons v. O'Neal, 60 Mo. App. 530. (3) Discrepancy in consideration mentioned in deed is a badge of fraud. Sec. 2881, R. S. 1909; Benne v. Schnecko, 100 Mo. 256; Bump on Fraudulent Conveyances (3 Ed.), pp. 34, 42, 51, 306. (4) Sale under Winkelmeyer deed of trust was but a scheme to relieve real estate in question from the outstanding inchoate right of dower in bankrupt's first wife and of the judgment lien upon the property in favor of Pendleton et al. and Broadhead to use. (5) Property in question stood in the same position in reference to bankrupt's creditors after sale under deed of trust as before said sale, no person holding record title to said property after said sale had paid anything of value, there being but a substitution

of the deeds of trust placed thereon by Helen Caldwell for the deed of trust thereon held by Winkelmeyer. (6) The bankrupt Von der Ahe never had a homestead right in the real estate as against debts of Pendleton et al., Broadhead to use and the Anheuser-Busch Brewing Association, all of which were contracted while bankrupt was a single and unmarried man and at a time when bankrupt had abandoned any prior homestead right he may have had in this real estate. The real estate in question was over three times in size that permitted to be held under the law as a homestead. Secs. 6704 and 6711, R. S. 1909; Smith. v. Bun, 75 Mo. 563; Kaes v. Gross, 92 Mo. 655; Snodgrass v. Capple, 131 Mo. App. 351.

WOODSON, P. J.—The plaintiff, as trustee in bankruptcy, of the estate of Chris Von der Ahe, instituted this suit, creditor's bill, in the circuit court of the city of St. Louis, to set aside and for naught hold certain deeds of conveyance mentioned in the pleadings and evidence, conveying the real estate in controversy, situate in the city of St. Louis, on the ground of fraud, and to recover same from the defendants, the present title to which now rests in the defendant Kaiser Investment Company.

The substance of the pleadings are briefly and fairly stated by counsel for appellant in the following language:

"Plaintiff's amended petition, upon which trial was had, states that in the year 1898 and for some time prior Chris Von der Ahe was the owner of certain real estate in the city of St. Louis, Missouri, being a lot of ground in city block 2386, beginning at a point on the north line of St. Louis avenue 105 feet and 10 inches west of the west line of Grand avenue and running westwardly along the north line of St. Louis avenue 145 feet more or less to the west line of lot nine

of said block; thence northwardly and parallel with the west line of Grand avenue 115 feet to an alley fifteen feet wide; thence eastwardly and parallel with St. Louis avenue 145 feet to a point; thence southwardly and parallel with Grand avenue 115 feet to the north line of St. Louis avenue, the point of beginning.

"That on the 8th day of December, 1894, Chris Von der Ahe and Emma Von der Ahe, his wife, executed a deed of trust on this real estate in favor of David J. Hayden, trustee, to secure the payment of certain promissory notes of the sum of $11,000.

"It is further charged in the petition that bankrupt Chris Von der Ahe, prior to 1898, became indebted to the extent of $21,000 to creditors represented by the trustee in this action, a portion of which were proven against bankrupt estate to the extent of over $12,000 in all. A large portion of the debts proven were contracted prior to the year 1898.

"It further appears from the plaintiff's amended petition that the bankrupt, together with the defendant Anna K. Von der Ahe, who was then and is now the wife of said bankrupt, on the 29th day of January, 1900, conveyed all of the aforementioned real estate to the defendant Max Kaiser for a pretended consideration of $1000; that on the same day defendant Max Kaiser conveyed the said real estate to defendant Anna K. Von der Ahe for a pretended consideration of $1000, both of which deeds were recorded in the office of the recorder of deeds in the city of St. Louis, Missouri, on the 22d day of May, 1902; and that on the 3rd day of September, 1902, bankrupt Chris Von der Ahe and his wife, the defendant Anna K. Von der Ahe, conveyed the same real estate to John S. King for a pretended consideration of the sum of $5, and in confirmation and in recognition of the deeds from bankrupt Von der Ahe and his wife, defendant Anna K. Von der Ahe, to defendant Max Kaiser, and from Max Kaiser to the defendant Anna K. Von der Ahe, for a pretended con-

sideration of the sum of $5, and in confirmation and in recognition of the aforementioned deeds executed on the 29th day of January, 1900, from bankrupt Von der Ahe and his wife, defendant Anna K. Von der Ahe, to defendant Max Kaiser, and from the defendant Max Kaiser to the defendant Anna K. Von der Ahe, which later deeds were recorded on the 3rd day of September, 1902.

"It is further charged in plaintiff's amended petition that on the 10th day of December, 1903, the said real estate was sold by the trustee under the deed of trust executed by the bankrupt and his first wife, Emma Von der Ahe, for a pretended consideration of $10,000, to Christiana Winkelmeyer, the owner of the deed of trust, who in turn, on the same day, conveyed said real estate to Helen Caldwell, who is the defendant Helen Caldwell How, for a pretended consideration of $11,500, who in turn, on the 14th day of December, 1903, executed three first deeds of trust on this real estate to August Gehner, trustee for John A. Tomhagen, to secure the payment of principal notes aggregating $10,500, and the interest to accrue thereon; that on the 15th day of December, 1903, said defendant Helen Caldwell How executed a second deed of trust on all of this real estate to August Gehner, trustee for John A. Tomhagen, to secure payment of principal notes aggregating $2025; that on the 4th day of January, 1904, the defendant Helen Caldwell How transferred the remaining equity in this real estate to the defendant Kaiser Investment Company; that all of these conveyances were duly recorded in the office of the recorder of deeds in the city of St. Louis, Missouri.

"It is further charged in the petition that James M. Franciscus, Charles C. Kunz and Robert A. Quackenboss, at the instance and request of the bankrupt Von der Ahe and his wife, defendant Anna K. Von der Ahe, and defendant Max Kaiser, organized the defend-

ant Kaiser Investment Company, a corporation, under the laws of the State of Missouri, for the purpose of receiving and holding the legal title to this real estate, and subsequently transferred to the bankrupt Von der Ahe and his wife defendant Anna K. Von der Ahe, and defendant Max Kaiser, all of the shares of stock of said corporation; that the purpose and effect of all of these conveyances other than the first deed of trust executed by the bankrupt Von der Ahe and former wife Emma Von der Ahe, was to hinder, delay and defraud the creditors of the bankrupt Chris Von der Ahe, and prayed for a decree setting aside all of said conveyances and to declare the real estate to be the property of bankrupt Von der Ahe, and ordered sold for the payment of the indebtedness of said bankrupt, subject to certain deeds of trust executed by Helen Caldwell, provided the court found that they were valid and subsisting liens on said real estate and that defendants be required to account for the income from said real estate and for such other and further relief as may under the premises to the court seem meet, just and proper.

"Defendant Anna K. Von der Ahe, answering plaintiff's amended petition, filed a general denial, with admissions that bankrupt Von der Ahe was in the year 1898 and for some time prior thereto the owner of the real estate mentioned in plaintiff's amended petition, the execution of the deed of trust by bankrupt Von der Ahe and his wife, Emma Von der Ahe, on the 8th day of December, 1894, and alleges that the conveyances of bankrupt and his wife, defendant Anna K. Von der Ahe, to Max Kaiser, and from Max Kaiser to defendant Anna K. Von der Ahe, were never delivered by bankrupt and defendants Anna K. Von der Ahe and Max Kaiser, and further alleges that both of said conveyances were at all times null and void; admits the execution and delivery of deeds from bankrupt Von der Ahe and his wife, defendant Anna K.

Von der Ahe, to John S. King and from John S. King
to defendant Anna K. Von der Ahe, but denies that
these deeds were fraudulent; admits that the real es-
tate was sold on the 10th day of December, 1903, by
the trustee under the deed of trust executed by bank-
rupt and Emma Von der Ahe, his first wife, to Chris-
tiana Winkelmeyer, but denies that the sale and pur-
chase under deed of trust was fraudulent; admits the
conveyance of said real estate from Christiana Wink-
elmeyer to Helen Caldwell, but denies said conveyance
was fraudulent; admits that on the 14th day of Decem-
ber, 1903, defendant Helen Caldwell executed the three
first deeds of trust to August Gehner, trustee, to se-
cure the payment of her promissory notes to John A.
Tomhagen, aggregating $10,500, and the second deed
of trust to secure the payment of her promissory note
for $2025, to same party, and that the notes secured by
said second deed of trust have been paid, and avers
that the same were paid by defendant Anna K. Von der
Ahe.

"Denies that the conveyance from defendant Helen
Caldwell How to defendant Kaiser Investment Com-
pany was for a pretended consideration and fraud of
creditors of bankrupt Chris Von der Ahe; that in fact
the conveyance executed by Helen Caldwell How to de-
fendant Kaiser Investment Company was null and void
because Kaiser Investment Company did not exist and
was not a body corporate and was incapable of holding
and owning the title to said real estate at the time of
the conveyance from Helen Caldwell How to defend-
ant Kaiser Investment Company.  That the title to
said real estate is in fact in defendant Helen Cald-
well How, who holds same in trust for defendant Anna
K. Von der Ahe, and that defendant Anna K. Von der
Ahe has received the rents and profits of all of real
estate for her sole use and benefit and paid out certain
amounts for interest, taxes and upon the promissory
notes secured by the second deed of trust executed by

Helen Caldwell How. That all of real estate was at all times prior to conveyances and at the time of the conveyances the homestead of bankrupt.

"The answer of defendant Kaiser Investment Company to plaintiff's amended petition was a general denial, with admission regarding ownership of real estate by bankrupt at and prior to 1898, the execution of deed of trust by bankrupt and his former wife on December 8, 1894, also deeds from bankrupt and his wife, the defendant Anna K. Von der Ahe, to defendant Max Kaiser, and the deed from Max Kaiser to Anna K. Von der Ahe, and charges that said last two conveyances were null and void. Admits the execution of conveyances from bankrupt and his wife, defendant Anna K. Von der Ahe, to John S. King, and from John S. King to defendant Anna K. Von der Ahe, and asserts they were bona-fide conveyances and for a valuable consideration; admits the sale of real estate under deed of trust executed by bankrupt and his former wife, Emma Von der Ahe, to Christiana Winkelmeyer, and the conveyance from said Christiana Winkelmeyer to defendant Helen Caldwell How, and the execution of the four deeds of trust upon said real estate by defendant Helen Caldwell How to August Gehner, trustee, to secure the promissory notes of John A. Tomhagen, and charges all were bona-fide conveyances and for a valuable consideration, and further charges that the promissory notes, aggregating $2025, secured by the second deed of trust on said real estate, have been fully paid and discharged by defendant Kaiser Investment Company. Admits that defendant Helen Caldwell How, on the 15th day of December, 1903, conveyed by warranty deed all of the real estate in question to defendant Kaiser Investment Company, subject to the four deeds of trust placed thereon by said defendant, and charges that ever since that date defendant Kaiser Investment Company has held and now holds the title to said real estate in good faith and for its sole use

and benefit, and ever since the 15th day of December, 1903, has received the rents and profits of said real estate in good faith and for its sole use and benefit, and that since acquiring title to said real estate it has paid out and expended certain moneys in payment of taxes, interest and upon the said second deed of trust; also states that at the time of conveyances by bankrupt the real estate was the homestead of said bankrupt.

"The answer of defendant Max Kaiser to plaintiff's amended petition was a general denial, and the adoption of the separate answer of the defendant Kaiser Investment Co.

"The answer of defendant Helen Caldwell How to plaintiff's amended petition was a general denial and the adoption of the answer of defendant Anna K. Von der Ahe.''

The trial before the chancellor, Hon. Moses N. Sale, resulted in a finding of the facts and a decree in favor of the defendants from which the plaintiff in due time and in proper form appealed the cause to this court.

## APPELLANT'S EVIDENCE.

In brief the evidence of the appellant tended to prove the following facts:

That about the year 1875 Chris Von der Ahe acquired the real estate in question, and erected the buildings thereon some time prior to the year 1894; that on the 8th day of December, 1894, Chris Von der Ahe and his then wife, Emma, placed a deed of trust on said real estate to secure $11,000, money borrowed from one Winkelmeyer.

That between the years 1894 and 1902, Chris Von der Ahe contracted the debts previously mentioned, aggregating twenty odd thousand dollars.

That on or about August 17, 1899, Henry C. Becker instituted a suit in the circuit court of the city of St.

Louis against Chris Von der Ahe and his wife, Anna K., upon promissory notes aggregating approximately $15,000. That shortly after the institution of this suit Chris Von der Ahe and his wife Anna K., by a general warranty deed dated January 29, 1900, conveyed the property in question to Max Kaiser, a brother of said Anna K., and that on the same date said Max by a general warranty deed conveyed the same land to his sister, Anna K. Von der Ahe. Both deeds were duly recorded May 22, 1902. That both of said deeds were without consideration. (This, however, seems to me to be immaterial, because all parties concede that both were void because never delivered.)

That Chris Von der Ahe and Anna K., his wife, on September 3, 1902, by deed duly executed conveyed said real estate to John S. King, and that on the same day said King by deed duly executed conveyed the same land to Anna K. Von der Ahe, both of which were duly recorded. King testified that in so far as he knew no consideration for the deeds passed between the parties at the time of their execution.

That Winkelmeyer, the owner of the deed of trust dated December 8, 1894, executed by Chris Von der Ahe, and his wife, Emma, on said real estate, to secure a loan of $11,000, in the month of December, 1903, demanded payment of the same. That up to that time Chris Von der Ahe collected the rents on said property, and from December 14, 1903, the rents were paid to the defendant, the Kaiser Investment Company. That at the time of the sale of the property under the Winkelmeyer deed of trust, Emma Von der Ahe, the first wife of Chris Von der Ahe, had an outstanding dower interest in said property (she having been divorced from Chris Von der Ahe on March 26, 1895) and that there were several judgment loans existing against the property.

That at the sale of the property under the Winkelmeyer deed of trust, Helen Caldwell became the pur-

chaser, for the sum of $11,500. That Helen Caldwell borrowed the money with which she purchased the property, and executed three or more deeds of trust on the same to secure the parties from whom she borrowed the money to pay Winkelmeyer. These deeds also included a small sum borrowed by her to pay cost and expenses of the foreclosure and sale of the Winkelmeyer deed of trust. All of these deeds were duly recorded on December 17, 1903, there being only one minute of time elapsing between the recording of each.

That on January 4, 1904, said Caldwell by a general warranty deed conveyed the said real estate, subject to the said deeds of trust, to the defendant, Kaiser Investment Company.

That the arrangements made for the sale of the property under Winkelmeyer deed of trust and the ultimate transfer of the same to the Kaiser Investment Company were done on behalf of Chris Von der Ahe.

That the bankrupt contracted the original debt with the Anheuser-Busch Brewing Association on August 4, 1896, while he was a single and unmarried man and not within the class of persons entitled to claim or hold a homestead, and the evidence further tended to show that at the time of contracting this debt, also the debt of Broadhead et al., and at the time the Pendleton judgment was rendered against him, the bankrupt did not reside upon or occupy any of the property in question as a homestead, or that he occupied none of this property as a homestead, until the spring of 1899.

RESPONDENT'S EVIDENCE.

The following facts are either admitted or practically not disputed.

It is admitted that Chris Von der Ahe duly acquired the title to the real estate described in appellant's amended petition from the owners thereof on the 20th day of December, 1875, and that Chris Von der

Ahe and Anna K. Von der Ahe were living upon said property at the time this case was tried in the circuit court. That Chris Von der Ahe and Anna K. Von der Ahe continued to live in one of the houses on said real estate up to the death of said Chris Von der Ahe, which occurred on the 5th day of June, 1913, and that said Anna K. Von der Ahe now occupies and lives in said house.

That Chris Von der Ahe and Emma Von der Ahe, his first wife, were legally married in 1870. That on the 8th day of December, 1894, Chris Von der Ahe and his then wife, Emma Von der Ahe, executed and delivered their promissory note for $11,000 secured by their deed of trust on said real estate. Appellant admits in his amended petition, upon which this case was tried, that said deed of trust securing said note for $11,000, executed by Chris Von der Ahe and Emma Von der Ahe, is and was at all times a legal and valid lien upon said real estate.

That Chris Von der Ahe and Anne K. Von der Ahe were legally married on August 18, 1898. That Max Kaiser and said Anna K. Von der Ahe were brother and sister.

The evidence tended to prove that prior to September 3, 1902, Chris Von der Ahe was legally indebted to Anna K. Von der Ahe in the sum of about $5000.

That in the year 1896, said Anna K. Von der Ahe, who was then Anna Kaiser, instituted suit for breach of promise against said Chris Von der Ahe in the circuit court of the city of St. Louis, Missouri, and that said case was settled out of court by Chris Von der Ahe agreeing to pay her $3000, but that only $800 of said $3000 was paid to her in cash, $200 to her and $600 to her attorney.

Chris Von der Ahe afterwards gave Anna K. Von der Ahe some old Sportsman's Park notes for the $2200 balance. None of these notes, nor any part

thereof, were ever paid, and Anna K. Von der Ahe returned all of said notes to Chris Von der Ahe. The $2200 was afterwards paid by said Chris Von der Ahe in the manner hereinafter set forth in this statement after numerous demands made by her upon him.

That Anna K. Von der Ahe had at different times loaned Chris Von der Ahe about $2000, in the manner to be presently stated. Anna K. Von der Ahe, among other things, testified that:

"Q. Well, what did the balance of the five thousand dollar debt from Chris Von der Ahe to you consist of? A. The other amount was a judgment I had against Mr. Von der Ahe for a breach of promise that Mr. William F. Woerner attended to. He was my attorney.

"Q. Do you remember what year you sued Mr. Von der Ahe for breach of promise? A. In 1896.

"Q. You say that was settled for three thousand dollars? A. Yes, sir.

"Q. Did he ever pay you any part of that? A. He never did.

"Q. That made up the whole five thousand dollars that he owed you? A. Yes, sir.

"Q. When you married him was there anything said to you at that time by Chris Von der Ahe about satisfaction of this judgment or claim that you had against him for this breach of promise suit? A. No, sir.

"Q. Isn't it a fact that when he consented to marry you that you agreed to relieve him from any liability on the claim for the breach of promise? A. No, sir.

"Q. You mean to tell the court that you retained your judgment against him for breach of promise when he consented to marry you? A. Yes, sir.

"Q. Now in reference to this breach of promise suit, did you come into this court and have a trial of the case? A. No, sir, Mr. Woerner settled it.

"Q. I thought you said you got a judgment? A. That is what Mr. Woerner told me. Mr. Woerner settled it for me. I don't know how those things are done.

"Q. Now, isn't it a fact that he settled it by Chris agreeing to marry you? A. No, sir. Mr. Von der Ahe was married at the time, and I sued him for breach of promise when he was married. . . .

"The Court (Q.): What did you get as a seltlement? A. Three thousand dollars.

"The Court (Q.): In money? A. No, sir.

"The Court (Q.): In what? A. Well, he was supposed—he paid me $200 and he was supposed to pay the rest in six months.

"The Court (Q.): Did he pay you the $200? A. Yes, sir.

"The Court (Q.): Did he pay you any of the balance? A. No, sir, he kept me off from time to time, and when I asked him for it after while he said he would give me that property for the money he owed me.

"Mr. O'Keefe: Did you take any notes or memorandum of what he owed you on the settlement? A. I held some notes, but I turned them over to him again.

"Q. When did you turn them over to him? A. In about 1900.

"Q. In about 1900? A. I think so. Those were notes secured by him, and he said if he would get the money he would pay me, but the notes were never paid, and I just turned them over to him, and he deeded that property over to me.

"Q. That was shortly after you were married that you surrendered those notes to him? A. No, sir. We were married quite a while before I surrendered them to him.

"Q. You just took a notion one day to surrender these notes without any reason for it? A. No.

"Q. What was the occasion? A. He asked me for those notes.

"Q. And you just willingly turned them over to him? A. He told me he would pay me some other way.

"Mr. Kelley (Q.): Now, Mrs. Von der Ahe, those notes that Chris gave you to hold until this three thousand dollar settlement of the breach of promise suit were paid, were never paid, were they? A. No, sir.

"Q. You gave them back to him? A. I did.

"Q. What did he owe you that five thousand for? A. Well, $1000 I sent him to Pittsburgh—

"Q. When did you loan Chris Von der Ahe this one thousand dollars? A. I gave him that on the 14th or 15th of February, 1898, when he was in Pittsburgh.

"Q. That was the time he got in jail at Pittsburgh? A. Yes, sir; and he sent Mr. Muckenfuss over to the house and asked if I could not send down any money, that he was hard up, and if I could get any I should send it to him, and I sent him one thousand dollars.

"Q. Where did you get that thousand dollars? A. Seven hundred and fifty dollars was my own money and two hundred and fifty I borrowed from my brother Max.

"Q. Is that the seven hundred and fifty that you had in the Northwestern Savings Bank? A. Yes, sir.

"Q. Mrs. Von der Ahe, what money did you have when you married Chris Von der Ahe? A. I had about a thousand dollars, what I had sent him on to Pittsburgh.

"Q. What? A. About a thousand dollars.

"Q. You didn't have that then when you were married? A. No, sir; but I had given it to Mr. Von der Ahe.

"Q. You made him a present of it? A. No, sir; I didn't do that.

"Q. Well, you said you gave it to him? A. I sent it to him, I said.

"Q. You were no relation of Mr. Von der Ahe's were you? A. No, sir.

"Q. You were not at that time? A. No, sir.

"Q. Was he married at that time? A. No, sir.

"Q. What? A. No, sir.

"Q. You mean to tell us' that he was not married in February, 1900—1898? A. No, sir.

"The Court (Q.): That is, you were not married to him. Was anybody else married to him? A. No, sir.

"The Court (Q.): Was he a single man at that time? A. Yes, sir; as much as I know.

"Mr. O'Keefe: You were not married to him at that time? A. No, sir.

"Q. And you were not married to him until August of that year? A. No, sir.

"Q. Do you recall about the time you made him the loan? A. February 14th or 15th I gave it to Mr. Muckenfuss and he sent it to Pittsburgh.

"Q. Now, what else did this debt consist of? You have told of one thousand dollars. A. Another thousand is what I borrowed from my mother from time to time, and gave it to Chris. That went up to another thousand.

"Q. When did you loan him the last of this second thousand dollars? A. I guess it was about in 1901.

"The Court (Q.): When did you get that thousand from your mother? A. At certain times up to 1901. This was before he transferred this property to me, but do not remember just how long before.

"Q. Didn't you and Chris Von der Ahe sign a deed to Max Kaiser to that property? A. We signed a deed, but it was never delivered.

"I do not know what became of that deed. Max signed a deed conveying the same property to me, but it was not delivered either.

"Q. Who got those deeds after they were signed, if you know? A. I don't know.

"Q. Do you know whether Chris did or not? A. We never got those deeds.

"Q. How is that? A. We never got those deeds.

"Q. Who do you mean by we? A. Max and I.

"Q. But what I want to get at is, did you deliver the deed that you and Chris signed to Max? A. We didn't—I did not.

"Q. When did you next see the deed that you and Chris signed, conveying the six stone-front houses to Max Kaiser, and the deed that Max Kaiser signed conveying these houses to you? A. When I seen them again?

"Q. Yes. A. When I took them out of the safe.

"Q. Out of whose safe? A. Out of Mr. Von der Ahe's safe.

"Q. When you took them out of the safe where was he? A. He was out of the city.

"Q. Did he tell you to go and get them? A. No, sir.

"Q. How did you happen to go and get these deeds? A. I had trouble with Mrs. Von der Ahe, and I understood it was my property, and I went and took those deeds and took them down town to Mr. Woerner, and Mr. Woerner said they were not recorded, and I should record them.

"Q. What Mr. Woerner? A. Mr. William F. Woerner, an attorney here.

"Q. What did you do with them? A. Mr. Woerner recorded them for me.

"Q. What were those deeds made for? A. To pay me my money that he owed me.

"Q. Who owed you? A. Mr. Von der Ahe.

"Q. How much did he owe you in 1900, at the time you and Chris Von der Ahe made the deed to Max Kaiser, and Max Kaiser made a deed to you? A. He owed me $5000.

"Q. Now, did Mr. Von der Ahe ever institute any court proceedings to set those deeds aside? A. He did.

"Q. How long afterwards? A. As soon as he came back.

"Q. As soon as he came back? A. Yes, sir.

"Q. Do you remember the time that you and Chris Von der Ahe signed a deed conveying the property described in the plaintiff's amended petition to John S. King? A. Yes, sir.

"Q. And John S. King signed the deed conveying certain property back to you, and certain property to Chris Von der Ahe? A. Yes, sir.

"Q. Now, will you just tell about that transaction—all about it in your own way? A. Yes, sir; Mr. Von der Ahe and I made a deed to Mr. King for all the property.

"Q. Tell the court what property it included? A. It included the northeast corner leasehold and northwest corner property, and the six stone-front houses, and Mr. King made a deed back to Mr. Von der Ahe for the northeast corner leasehold and northwest corner property, and he executed another deed for the six houses to me.

"Q. Were those deeds ever delivered? A. Yes, sir; they were delivered for the money that he owed me. For that reason they were made.

"Q. How much did he owe you at that time? A. Five thousand dollars.

"Q. Did he ever pay you any part of it? A. Never a cent.

"Q. Now, why did you and Chris Von der Ahe execute the deed to John S. King, and John S. King execute the deed to you? A. That was for that mat-

ter—Chris owed me that money, and to pay me for that reason it was done.

"Q. Any other reason that this property was transferred to you? A. No, sir; just what he owed me and for that reason he transferred that property over to me.

"Q. That was when? A. That was the 3d day of September, 1902.

"Q. Mrs. Von der Ahe, did you have any other purpose in taking title to this property in question than in payment of your debt—any other purpose whatsoever? A. No, sir.

"Q. State the purpose for which you took the title to this property September 3, 1902?

"Mr. O'Keefe: She has stated that.

"The Witness: I took it for the money Chris owed me.

"Q. Now, at the time this property was sold, tell the court in your own way what you did? A. You mean when it was sold under the deed of trust?

"Q. Yes. A. I went to Mr. Franciscus and told him, as this was my property I wanted him to buy it in for me, and I would like him to form a corporation, as I had had trouble with Mr. Von der Ahe before, and didn't know but what I would get into some more, and my father went down town and seen some one when that property was to be sold, and he got the advice that if I got up a corporation I would not have to have my husband's signature if I wanted to sell at any time, and I went to Mr. Franciscus' office and told him I wanted him to buy the property in for me, as it was my property, and I wanted to form a corporation.

"Q. Did you—what did you direct him to do? A. I directed him to form this corporation.

"Q. What did you direct him to do in regard to getting the title to the property before the corporation

was formed? A. I directed him to make a deed of trust.

"Q. Well, did you take the title to the property in your name from Mrs. Winkelmeyer? A. No, sir; it was taken in Helen Caldwell's name.

"Q. Well, how did it happen to be done? Who told them to do it? A. I told them to do it.

"Q. Why did you tell them to take it in Helen Caldwell's name instead of taking it in your own? A. Then I would be in just the same place again, and I would need his signature to everything, and that is what I didn't want. That is why I wanted to form the corporation, so I would not need his signature to sign any papers, or anything, if I wanted to sell, or get a loan of money on it, or anything like that.

"Q. Now, who did Helen Caldwell take the title to this property for, if you know? A. She held it in trust for me.

"Q. Where did you get the money to pay Mrs. Winkelmeyer the $11,500 purchase price of this property? A. I had Miss Helen Caldwell execute deeds of trust for me, so I could get the money.

"Q. How much did you raise on these four deeds of trust? A. The original deed was $11,500, and I added ten hundred and twenty-five to it, and made a second deed of trust.

"Q. How much were both deeds of trust, the first and second? A. Twelve thousand, five hundred and twenty-five dollars.

"Q. What became of this money? What was done with this money that Helen Caldwell borrowed on this property, described in plaintiff's amended petition? A. That was paid over to Mrs. Winkelmeyer.

"Q. Who did that? A. I did.

"Q. Do you remember when the Kaiser Investment Company was incorporated? A. It was incorporated the 28th day of December, 1903.

"Q. Now, after Mr. Franciscus and Mr. Kunz and Mr. Quackenboss had incorporated this Kaiser Investment Company for you, what did they do with the stock? A. They kept it in trust for me.

"Q. Well, did you ever order them to transfer it? A. I did later on.

"Q. Well, who did you order them to transfer that stock to? A. To transfer it to Mr. Franciscus, one hundred shares over to me and one share to Max Kaiser.

"Q. Well, how did you happen to transfer that share to Max Kaiser? A. Just to hold him in the corporation, because Mr. Quackenboss wanted to step out.

"The Court (Q.): Who held the balance? A. Mr. Kunz. He held forty-seven shares.

"Mr. Kelley (Q.): Now, how did you happen to have some of this stock transferred to Chris Von der Ahe, forty-seven shares of it? A. Well, Mr. Von der Ahe came and asked me if I would not loan him any of that stock, as he wanted to borrow some money, and that is how I transferred those forty-seven shares over to Chris.

"Q. Do you know who he borrowed the money from? A. From my brother, Max Kaiser.

"Q. Do you know how much it was? A. Well, he owed him that before that, and at that time he loaned him, I think, three hundred and fifty.

"Q. Chris Von der Ahe didn't pay you any money for that stock, did he—that forty-seven shares of stock? A. No, sir; I loaned it to him.

"Q. To secure the loan of Max? A. Yes, sir.

"Q. Now, this one share of stock that you had transferred to Chris Von der Ahe, what did you do that for? A. Just to hold him in the corporation, as it needed three.

"Q. How much stock had been transferred to you? A. One hundred shares of stock.

"Q. That was Mr. Franciscus'? A. Yes, sir.

"Q. And that left Mr. Quackenboss and Mr. Kunz still? A. Yes, sir.

"Q. And who transferred the forty-seven shares to Chris Von der Ahe? A. I told Mr. Kunz to transfer it to Mr. Von der Ahe.

"Q. And he did? A. Yes, sir.

"Q. What became of Mr. Kunz's other two shares of stock? A. I think Max got them.

"Q. How did he happen to get them? A. Well, I owed him one hundred dollars, and I asked him if he would not take those two shares of stock in payment of it, and he said he would.

"Q. How did they happen to be transferred over to him? A. It was done at my direction.

"Q. Now, Mrs. Von der Ahe, how much have you paid out in taxes on this property since September 3, 1902? A. I have paid out for city and school taxes five thousand one hundred and nine dollars and some cents.

"Q. Do you know how much those taxes run a year? A. They run from about three hundred—

"The Court (interrupting): What is the purpose of this?

"Mr. Kelley: I want to show she has been paying off debts on this property, taxes, and so forth.

"The Court: She has been getting the income, too, hasn't she?

"Mr. Kelley: Yes, sir.

"The Court: I don't think that cuts any figure in the case. She was getting the income from the property and she paid the taxes. I don't expect in this action if a decree goes against her to hold her for any income, and, of course, I cannot take into consideration the fact that she paid the taxes.

"Mr. Kelley (Q.): State whether or not you have held this property, the title to this property, for Chris

Von der Ahe, since it was conveyed to you? A. No, sir; it was my property.

"Q. Has he gotten the rents and profits and income from it? A. No, sir.

"The Court (Q.): Who has been collecting the rents? A. I did.

"The Court (Q.): You collected them yourself? A. Yes, sir.

"The Court (Q.): Since when? How long have you been collecting them? A. The last four years."

William F. Woerner testified substantially as follows:

"Q. Do you know Mrs. Anna K. Von der Ahe? A. I do.

"Q. Did you represent her in the breach of promise suit against Chris Von der Ahe? A. I did.

"Q. About what year did you file that suit? A. I think it must have been about the latter part, or some time in 1896.

"Q. About 1896? A. Yes, sir.

"Q. And what was the termination of that suit? A. That suit was disposed of by a settlement between the parties.

"Q. It never went to trial? A. It was never tried.

"Q. It was settled out of court? A. Yes, sir.

"Q. Do you remember the amount of the settlement? A. I do. Three thousand dollars.

"Q. Do you remember whether or not Mrs. Von der Ahe took any note or any evidence of that indebtedness from Mr. Von der Ahe? A. The witness: To the best of my recollection I advised Mrs. Von der Ahe to take nothing but cash, but there seemed to have been a great deal of difficulty of getting cash, and my recollection is that it was partly paid in cash and partly in notes.

"Mr. Kelley: Q. Do you remember how much cash? A. Notes that were supposed to be good at that time.

"Q. Do you remember how much cash? A. Well, I know that there was six hundred dollars paid in cash, and I think something in addition to that—several hundred dollars more than that.

"Q. In cash? A. Yes, sir; I believe two hundred dollars. I think the entire payment in cash was eight hundred dollars.

"Q. One of the terms of that settlement was he had to pay your fee? A. Yes, sir.

"Q. And that was six hundred dollars? A. Yes, sir; I insisted upon Mr. Von der Ahe paying that in cash.

"Q. That was six hundred dollars? A. Yes, sir.

"Q. And two hundred additional that you speak of was to her? A. Yes, sir; I insisted that she should get at least some cash.

"Q. Do you know whether or not she ever got any Sportman's Park notes? A. Well, now, I cannot testify to that, because I don't recollect whose notes they were, but they were stated to me to be perfectly good. Mr. Von der Ahe assured me time and again they were good.

"Q. You don't know whether the notes were ever paid? A. I do not."

"CROSS-EXAMINATION.

"Q. When was that settlement made? A. That settlement was made in August, 1897. The money was paid then.

"Q. 1897? A. Yes, sir.

"Q. These notes were delivered to Mrs. Von der Ahe at that time? A. I do not know. I think they were.

"Q. Did you handle the transaction about the closing of the deal? A. I arranged the terms and the parties both stated that the matter had been settled and the suit dismissed.

"Q. You never did see the notes? A. Now, I am not prepared to testify to that. I cannot recall whether I actually saw the notes or not, but I know there was a bona-fide consideration of three thousand dollars, or that suit would not have been dismissed.

"Q. You didn't know at the time the settlement was made whether or not there was an agreement on Mr. Von der Ahe's part to marry the then Miss Anna Kaiser? A. Well, he was married at that time, and that is why the breach of promise was brought.

"Q. He was married at that time? A. Yes, sir.

"Q. You would not undertake to say but what those notes were surrendered in settlement of the debt by Mr. Von der Ahe marrying Miss Anna Kaiser? A. I do undertake to say that that consideration passed for the settlement of the breach of promise case, for the damages that were claimed in that petition."

Joseph F. Obernier testified:

"Q. What is your business? A. Cashier of the Northwestern Bank.

"Q. Was it the Northwestern Savings Bank in the year 1897? A. Yes, sir.

"Q. I now hand you some papers. Will you tell the court what they are? A. They are certificates of deposit in the name of Anna Kaiser.

"Q. Anna Kaiser is now Mrs. Anna Von der Ahe? A. Yes, sir.

"Q. What are the amounts of those certificates of deposits? A. The full amount is seven hundred and fifty dollars.

"Q. Were they issued by your bank? A. Yes, sir.

"Q. For money she put in there? A. Yes, sir."

There was also one for $250. All of them were introduced in evidence.

"Mr. Kelley: Q. The money called for in all these certificates of deposit was deposited by Anna Kaiser, who is now Anna Von der Ahe? A. Yes, sir.

"Q. Do you know when she drew this money out? A. Yes, sir: February 14, 1898.

"Q. February 14, 1898? A. Yes, sir.

"Q. I now hand you two papers and ask you what they are? A. They are certificates of deposit issued by the Northwestern Savings Bank payable to Max Kaiser, one for one hundred and the other for one hundred and fifty dollars.

"Q. Bearing what date? A. The one-hundred-dollar one bears the date July 21, 1897, and the one for one hundred and fifty dollars, September 13, 1897.

"Mr. Kelley: I offer them in evidence, your Honor, and ask that they be marked as exhibits.

"The Court (Q.): That money was drawn out of your bank, was it? A. Yes, sir.

"The Court (Q.): On all the certificates? A. Yes, sir.

"Mr. Kelley: When did Max Kaiser draw out that $250? A. The same day, February 14, 1898."

Max Kaiser among other things said:

"Mr. Kelley: Q. Now, Mr. Kaiser, do you remember the time that Chris Von der Ahe was in jail in Pittsburgh? A. Yes, sir.

"Q. What year was that? A. I think—1897.

"Q. 1897? A. Yes, sir.

"Q. Do you know whether or not of your own knowledge your sister sent him any money at that time? A. I do, sir.

"Q. How much? A. It was $1000."

The testimony of numerous witnesses shows that the property in question was worth at the time it was conveyed to Anna K. Von der Ahe, about $15,500; some

testified it was worth about $17,000, others $16,000 and some others $14,000 or $15,000.

The evidence also tended to show that at that time Chris Von der Ahe had a homestead right in said property of the value of $3000.

On the date of the institution of the bankruptcy proceedings against Chris Von der Ahe, his indebtedness aggregated some $21,000, some of which had been reduced to judgments. Of that $21,000 of indebtedness, only about $12,000 of it was proven up against him before the referee in bankruptcy.

Upon cross-examination of Charles C. Kunz, a witness introduced by appellant, he testified as follows:

"Q. Now, before the sale under the deed of trust, Mrs. Anna K. Von der Ahe owned these six stone-front houses, didn't she?

"Mr. O'Keefe: Well, the deeds are the best evidence of that.

"Mr. Kelley: I want to prove a conversation now he had with her.

"Q. Do you remember that? A. I think so, but I would have to refer to the deed myself.

"Q. Do you remember about the time this sale was to take place and Mrs. Von der Ahe came to you and had a conversation with you about this property? A. Yes, sir.

"Q. What did she say, Mr. Kunz? A. My recollection is that she wanted us to buy the property and have us make a loan for her. That is what she asked at the time.

"Q. And she told you at that time it was her property and she wanted to protect it? A. Yes, sir.

"Q. Didn't she tell you she had had trouble with Chris and she didn't want to take the title in her name, or something to that effect? A. I think she did.

"Q. And then did she direct you to get the title for her to this property? A. You mean to purchase it?

"Q. Yes, sir; from Mrs. Winkelmeyer? A. I think so, yes.

"Q. And you did that as her agent? A. Yes, sir.

"Q. How did you happen to put the title to this property in the name of Helen Caldwell? A. We had it put in her name temporarily until the company was organized.

"Q. Who was that for? A. It was for Mrs. Von der Ahe at that time.

"Q. Now, then, Helen Caldwell never paid a dollar for that property? A. No, sir.

"Q. And how did Helen Caldwell happen to execute these notes and deeds of trust to August Gehner for $12,525? A. By request of our office.

"Q. For Mrs. Von der Ahe? A. Yes, sir.

"Q. But you were acting as agent for Mrs. Von der Ahe? Is that right? A. Yes, sir.

"Mr. Kelley: Q. Now, all the interest then that Helen Caldwell had in this property was to hold it for Mrs. Von der Ahe until this corporation was organized? A. Yes, sir.

"Q. Did Mrs. Von der Ahe tell you to organize the Kaiser Investment Company? A. Yes, she did.

"Q. She instructed you to do that, did she? A. Yes, sir.

"Q. And did she give you her reason for that, wanting that company organized? A. Yes, I think I mentioned that before, that she could not hold the title to it, being a married woman.

"Q. And had had trouble with Mr. Von der Ahe —did she mention that? A. Yes, sir.

"Q. And in case she wanted to convey it or mortgage it, she wanted it so she could do that? A. Yes, sir.

"Q. Do you remember that? A. Yes, sir.

"Mr. Kelley: Q. Then you were acting as agent for Mrs. Von der Ahe in getting this loan from Gehner? A. Yes, sir.

"Q. And in having this transfer made from Christina Winkelmeyer, is that right? A. Yes, sir.

"Q. Did you pay out the money realized from these loans. For whom did you pay out the money realized from these loans, from Mr. Gehner? A. For whom?

"Q. For whom, yes. A. Why, it was paid out for Mrs. Von der Ahe, but the Kaiser Investment Company was the way the account was on the books.

"Mr. Kelley: Q. Now, Mr. Kunz, will you look at that paper and tell me what it is (indicating paper)? A. It is articles of corporation.

"Q. For what? A. Kaiser Investment Company.

"Q. Will you tell me the date on that—when that was issued by the Secretary of State of Missouri? A. The 28th day of December, 1903.

"Q. Yes, sir. Now, will you look at the paper I now hand you (handing witness paper)? A. That is a general warranty deed from Helen Caldwell to the Kaiser Investment Company.

"Q. What date does that deed bear? A. The 15th of December, 1903.

"Q. When was that deed acknowledged? A. The 15th day of December, 1903.

"Q. The same day it was recorded? A. Yes, sir.

"Mr. Kelley: Q. The deed from Helen Caldwell to the Kaiser Investment Company then was made fifteen days before the Kaiser Investment Company was incorporated, wasn't it? A. About thirteen days.

"Q. About thirteen days? A. Yes, sir.

"Q. Now, when Helen Caldwell executed that deed, what did she do with it? A. Why, I don't recall.

"Q. Gave it back to you didn't she? A. I could not say that.

"The Court: Very likely. We will admit that she did. It doesn't make any difference.

"Mr. Kelley: Q. Now, all the interest then that Helen Caldwell had in this property was to hold it until this corporation was organized? A. Yes, sir.

"Q. Did Mrs. Von der Ahe tell you to organize the Kaiser Investment Company? A. Yes, she did.

"Q. She instructed you to do that, did she? A. Yes, sir.

"Q. And had had trouble with Mr. Von der Ahe —did she mention that? A. Yes, sir.

"Q. And in case she wanted to convey it or mortgage it, she wanted it so she could do that? A. Yes, sir.

"Q. Do you remember that? A. Yes, sir."


I.    There is no question but what Chris Von der Ahe, the husband of Anna K. Von der Ahe, was hopelessly insolvent at the time he transferred the property to the respondent, his wife; and it cannot be successfully contended that the evidence for the appellant did not tend strongly to prove that said transfer was made to defraud his creditors of their just dues. In other words, I feel satisfied from reading this voluminous record, about three hundred printed pages, that appellant made out a strong case in behalf of the creditors, and had there been no evidence to the contrary, doubtless the learned chancellor should, doubtless would, have found for the appellant and decreed the deeds mentioned to be null and void. But when we view the entire case, both sides, as illuminated by all the evidence introduced, that for the appellant, as well as that for the respondents, quite a different color and character are given to the facts sought to have been established by appellant.

**Fraudulent Conveyance: Preferring Wife.**

What are the facts of the case as learned chancellor found them to be? Answer: When Chris Von der Ahe married the respondent Anna K. Kaiser, he owned the property in question, worth about $15,500, possibly $16,000, as well as other real estate, which was incumbered by a deed of trust executed in behalf of Mrs. Winkelmeyer to secure a loan of $11,000 and interest. That when this deed of trust was foreclosed, or rather when the sale took place under it, $12,525 was required to liquidate or pay that debt (all of which was assumed by the respondent, Anna K. Von der Ahe). That at the time of the transfer of said property in question to her he was indebted to her in the sum of at least $4200, made up of the $3000 recovered in the breach of promise suit, less the $200 paid her, and $600 paid to her attorney, the $1000 she sent to him in Pittsburgh and the $1000 she borrowed from her mother and turned over to him. If we add this $4200 to the $12,525 secured by the Caldwell deed of trust on the property and assumed by respondents, we would have the sum of $16,525. That sum unquestionably is at least $500 in excess of the actual value of the property when it was transferred to Anna K. Von der Ahe, to say nothing of the homestead rights of Chris Von der Ahe or the dower interest of Emma Von der Ahe, his former and divorced wife.

These observations are in harmony with the written memoranda of the chancellor's findings and decree filed in the case, and embodied in the record.

If this is true, which we must accept as such, since the chancellor so found from the preponderant evidence, then the findings and decree of the circuit court must not be disturbed without they contravene some law of the State or sound principle of equity. [Huffman v. Huffman, 217 Mo. 182.]

II. Counsel for appellant has assigned many legal objections to the findings of the court, but after a

careful consideration of each and all of **Fraudulent** them, I am convinced that there is but one **Conveyance:** of them that requires special considera- **Breach of** **Promise Notes.** tion at the hands of this court, and it is couched in the following language:

"(a)    Promissory notes received by defendant Anna K. Von der Ahe in settlement of breach of promise case were not the bankrupt's obligations.

"(b)    Marriage of defendant to bankrupt subsequent to execution and delivery of these notes destroyed their validity.

"(c)    Delivery of notes by defendant Anna .K. Von der Ahe to bankrupt after her marriage to bankrupt raised the presumption of payment.    [22 Am. & Eng. Ency. Law (2 Ed.), 589; Lawson v. Gudgel, 45 Mo. 480; Stephenson v. Richards, 45 Mo. App. 544; Nat. Tube Works Co. v. Machine Co., 118 Mo. 365, l. c. 376; Klauber v. Schloss, 198 Mo. l. c. 513.]"

This objection seems to be composed of three elements, which I have designated by the letters *a, b,* and *c,* and for convenience I will consider them in the order stated.

(a)    Attending the first:   I am not clear that I comprehend the meaning of counsel as stated in clause (a) of this objection.

It is conceded that the promissory notes received by the respondent Anna K. Von der Ahe, (*nee*) Anna K. Kaiser, were not the personal obligations of Chris Von der Ahe, but were notes or obligations issued by the Sportman's Park Association, which the evidence shows he owned and transferred to her in satisfaction of the amount he owed her on account of the settlement of the breach of promise suit mentioned.   I am unable to see that there would have been any difference in the legal effect of the settlement, had Chris Von der Ahe given her his individual promissory note instead of those of the Sportsman's Park Association.   I can readily see how there might have been a difference

in the value of the notes issued by Chris and those issued by the Association; but that fact in no manner could have affected the character of the settlement, or have destroyed their validity.

In my opinion, there is no merit in this element of the objection.

(b) Regarding the second: Counsel have cited us to no authority supporting the contention that the mere fact of the marriage of Chris Von der Ahe to Anna K. Kaiser, subsequent to the sale and transfer to her of the notes of the Sportsman's Park Association in settlement of the breach of promise suit, nullified them or destroyed their validity. Nor has any suggestion or reason been assigned why that should be true; and after much thought and reflection I have been unable to see any solid foundation upon which to predicate such a contention. In my opinion it is wholly untenable.

(c) Respecting the last contention: It might be conceded (in the absence of the statute that declares all gifts, etc., of money and property by a wife to her husband not in writing shall be void) that the delivery of the notes by the wife to her husband raised a presumption of payment, yet the uncontradicted evidence shows that it was not the intention of the wife to give the notes to her husband, but clearly her intention was to lend them to him in order that he might use them as collateral security for money he desired to borrow.

The authorities cited in support of this proposition have no application to the facts of this case. Had Chris Von der Ahe been the maker of the notes, and had the wife delivered them back to him, in the absence of all evidence, then a presumption of payment would have arisen, but not so in a case like this, where a third party was the maker, and the delivery fully explained by the evidence.

There is no merit in the objection.

III. After a careful consideration of the record in this case, and a review of the authorities cited, I am satisfied that Chris Von der Ahe was legally and justly indebted to his wife, Anna K., in the sum **Fraudulent** of $4200, and that he conveyed the prop- **Conveyance: Full Value** erty in controversy to her subject to the **of Property.** deeds of trust thereon, in satisfaction of that indebtedness, which was more than the property was worth, and so believing, in my opinion, the judgment of the circuit court should be affirmed.

It is so ordered. All concur.